The next case today, number 211384241201, Krisma Phelan Monzali Bopaka v. Merrick B. Garland. Will counsel for petitioner please come up and introduce yourself on the record to begin. Good morning, Your Honors. I'm Stephanie Merzi for Mr. Monzali Bopaka. We would like to request eight minutes for myself, six minutes for MBTA, and one minute for the board. Speak up, please. Certainly. We'd like to request eight minutes for myself, six minutes for AMICI, and one minute for rebuttal, please. Yes, no problem. May it please the Court. This record contains five death certificates of members of Mr. Monzali Bopaka's family. All of them died on the same day, and nobody has really challenged whether these people died. There's no indication in the record whether those murders were ever investigated or prosecuted. Despite this, the immigration judge denied all relief erroneously because he didn't believe Mr. Monzali Bopaka for five reasons. I will address them in turn. Is there anything in the death certificates themselves that indicates or shows that the cause of death was murder? Yes, Your Honor. They do state that the cause of death was assassination at their residence. The first issue identified by the immigration judge was omission, that Mr. Monzali Bopaka failed to mention his means of escaping the Congo either in his asylum application or his declaration, and therefore the immigration judge said that he was dishonest when he discussed it in court. However, before court, he was never asked the question. He never had the opportunity to explain the circumstances of how he escaped the Congo. When he was asked, he readily discussed it. And under this court's precedent, Cartes-Chevaux v. Holder, when the question is never asked, it can't count as an omission. The immigration judge had about a dozen different reasons, and are you about to go through each one of them and explain? Because the way I read it, there is quite ample basis to conclude that he was not credible in his testimony. The immigration judge then said, but you can show me independent evidence which might change my mind. You seem to say that was an error of law? My argument first is that some of these discrepancies aren't supported by the record. And in substantial evidence review, your honors don't have to find that each one of them was unsupported. Rather, there were five reasons. It was a five-legged stool. If any of those don't continue to stand, then remand would be appropriate. As well, Mr. Mazzoli-Bocacca did bring new evidence. I'm sorry. If he is correct on four of the five legs, and we have doubts about one, you say that is sufficient to find there's no substantial evidence? I do think it's, you know, the substantial evidence requires the court to look at the entire record. Well, yes, we can agree on that. Do you have a case that actually says if they're not credible on a number of points, but the IJ may have gotten it wrong on one point, that we have to vacate and remand? So, I don't know that it's the number of points in particular. So, can we just move on? Certainly. I would like to mention a few cases there. So, there is Mbowa v. Lynch from 2015, Castillo v. Gonzalez from 2007. In those cases, there were not all the points, again, that the court found were problematic. There was cause for remand. So, I don't know if it's the number of points. It's rather the significance of those points. Counsel, can I ask you about the death certificates? Because you started with that. Obviously, those are very important evidence of what happened to his family, and they were not translated, correct? The death certificates were translated. The thing that was not translated was a newspaper article about what happened to this family. I see. So, the IJ did know that the death certificate said that the family had been assassinated at the residence. He did. There was an issue with basically- I'm sorry. What was the additional information in the newspaper article that you think was critical that was not translated? The newspaper article was specifically about what happened to this family, mentioning Mr. Gonzalez-Bopaca and his brother by name, explaining that the family was essentially the victim of government persecution. And that was not in the record. That was not before the immigration judge because it had never been translated. And how does that, the fact that it wasn't translated, that the lawyer for your client at the time didn't have them translated, where does that fit into the arguments that you're presenting on appeal? Certainly. It goes to ineffective assistance and also to financial means. So, first, there were two attorneys involved before the immigration court hearing. The first attorney submitted these articles without translation to the court, and I think the issue there was that she did not have payment to make a translation of those articles. Then the second attorney either failed to get a copy of the articles, failed to submit a translation. For whatever reason, the translation wasn't before the court, and the court is not allowed to consider untranslated documents. And how would the ineffective assistance, where does it fit in on what you think should happen now? Certainly. So the ineffective assistance goes to whether the new evidence was not available, whether it could have been presented at the previous hearing. So regarding that, I mean, this case is under several very unusual circumstances. The petitioner was detained and indigent, but it was also the height of the COVID-19 pandemic. His hearing was in May of 2020. There were stay-at-home orders. We were all still figuring out how to work by Zoom. So when the BIA didn't adequately consider whether this evidence was not available and could not have been discovered or presented, they didn't really discuss the meaning of what is not available. They just said this isn't it. Because you can't access the evidence, it doesn't mean that it was unavailable. And that does not accord with the plain meaning of not available. You know, something that is accessible or capable of being possessed or used would be available. And the agency didn't consider this. They didn't consider whether the circumstances here. For example, there was a marriage certificate. So the immigration judge found it problematic. Mr. Amanzali said that he was married. He didn't provide a marriage certificate. But the BIA didn't rely on that, right, and were reviewing the BIA's decision? I think that was the one discrepancy or lack of credibility finding that the BIA didn't even address its decision. Am I wrong on that? That's correct, Your Honor. And so when he did bring a marriage certificate, the counsel explained that it was due to the COVID-19 pandemic that he was unable to get a copy. Mr. Amanzali Bopaka himself didn't have a copy, and they weren't able to get another one. So the board, again, didn't really address why that would not fall under the definition of not available, something that could not have been presented at that hearing. Counsel, can I just focus you on the board's decision made alternative findings or alternative holdings, as I understood it? One is that the evidence was available, but two, that even if it had not been available, the BIA concluded it wouldn't have made a difference here. And so I'm wondering if you can address that part of its ruling, and specifically one of the key holdings of the IJ was that there were these discrepancies between your client's testimony about whether there was an arrest at all and what he had said in a declaration and his application, and the IJ gave him a chance actually before the hearing began to discuss with his attorney if he wanted to make any changes, and they said on the record, no, that they are accurate and no changes. And in the IJ's view, that discrepancy went to the heart of his claim. Did he have a reason to fear persecution? So can you just address would any of this new evidence – why is it an abuse of discretion for the BIA to conclude that none of the new evidence would really undermine that critical holding of the IJ? Certainly, Your Honor. So the first issue is that the expert report in the new evidence provides a completely independent basis for withholding of removal or convention against torture because even if you take Mr. Manzali Bopaka's testimony completely off the table, the expert stated that he would be in danger of detention and torture if he's returned to the Congo because of what he's done in the U.S. He's told a story about the Congolese government. They're very concerned about their reputation internationally, and that Mr. Manzali Bopaka would likely be detained at the airport. He would be questioned about what he said in the U.S. As well, the Congolese authorities would be able to type his name into Google and find his case. So that basis is completely independent from, you know, the events that happened in the Congo. Excuse me, doesn't that strike you as rather curious that someone who may otherwise be ineligible for asylum can gain asylum by illegally entering the United States, and they are making statements so critical of the government of the country that he's left and he will now be in danger if he's returned. Can an alien really create that kind of post-hoc asylum for himself? I think it actually, in this case, it doesn't matter what he said to the U.S. government. The Congolese government will believe that he has said these things, right? The Congolese government is very concerned about its reputation abroad. So in that sense, it doesn't really matter what he said. We've actually seen the pattern that Judge Selye just described in any number of cases of people from China, people from Indonesia who come here. Sometimes they suddenly become Christians. Sometimes they suddenly become vocal advocates against the country they've just left. And our court has repeatedly rejected that as a basis for overturning the lack of the IJs and BIAs, withholding that you did not meet asylum criteria at the time. Your Honor, my response to that is that the new evidence also directly addresses many of the IJs' credibility concerns. And he did state there is a particular need for corroborating evidence in this case because of his credibility concerns. So that is another reason that I do believe it is material. It would have an impact on the outcome of the proceeding because it goes directly to so many of those. Thank you. Thank you. Thank you, Counsel. Will Attorney Kim come up and introduce yourself on the record to begin? Good morning, Your Honors. May it please the Court. Thank you for allowing me to appear in this case. So I want to start with a point that Petitioner's Counsel pointed out. So I want to distinguish asylum from withholding a CAD. And for asylum it requires a subjective component of the eligibility. For withholding a CAD, they do not. So what's important is under this Court's case law, under the objective evidence, whether that objective evidence in this case would likely change the prior determination. And that question of the materiality is different from prima facie eligibility. And I understand Judge Lynch's question about the concern of this after arriving in the United States, changing their story or post-arrival events, the person seeking asylum. Okay. So you're arguing the BIA erred and we have to reverse it when they denied the motion to reopen. Okay. Is that where we are in this? Motion to remand, Your Honor. So just to clarify, there's a motion to remand as opposed to the request for remand during the initial appeal or the later motion to reopen? The former, Your Honor. Okay. So our argument really only focuses on motion to remand, the denial of the motion to remand based on the new evidence. And the reason why it's important is if the Court agrees with Amy about the materiality problem, that the BIA did not even engage with this objective evidence, whether how that would change the outcome of the prior determination. And on remand, the BIA can freely address the prima facie eligibility. So whether there is reasonable likelihood that this person would satisfy and prevail the withholding and CAT. And that's a separate element and from. So that's something that the BIA could address, even with this objective, the Dr. Carter's expert evidence, whether that evidence could establish his eligibility, prima facie eligibility, independent from that. And the evidence you're referring to is the expert witness report. And your argument is he was too poor at the time to hire an expert, and therefore the BIA committed an error of law in saying it was available earlier, and it actually wouldn't have made a difference? So it's two layers of the argument for the availability argument. So the first one is yes, yes. So our argument is yes. Because of the financial circumstances, we think that the evidence was not available. It could not have been presented or discovered. Do you think the immigration authorities are required to come up with funding for indigent people who are seeking asylum so they can hire expert witnesses? No, Your Honor, that's not what we are proposing. So I want to get to the point of what... I'm sorry. So what's wrong with the determination that the BIA made, if you're not arguing he had a right to funding to provide that evidence? Because of the reasoning invoked by the BIA. So if we look at this reasoning, the BIA said whether the evidence was previously unavailable. That's different from the issues related to accessibility issues. So that reasoning is incorrect because the regulation says not available and could not have been discovered or presented. So if the court does not agree with the BIA's bad reasoning, the court can vacate, doesn't need to reverse the agency's ultimate conclusion, but can vacate through the legal error, and send the case back and require the BIA to address whether, under the proper analysis of that problem, whether the petitioner truly did not have, whether this evidence was not available and could not have been presented or discovered at the time of the former hearing. Counsel, is your argument dependent on him being both detained and the financial unavailability? In other words, would you be making this argument if he had not been detained at the time? I don't think we would have. In theory, we could make an argument. I don't think our argument would be very compelling because his detention, the COVID-19 detention, directly went to the financial circumstances. Because even if a person is detained, a person could rely on the family members to raise the money or even have access to other experts, for example. But that's really not the case here because, and the record says, the circumstances that his family also went through. The record also shows that what he did his part to get a lawyer and trying to do, and getting assistance from the local. So is your argument really a very narrow one, then? You're just saying the particular reason the BIA gave for concluding that these were available was wrong because it applied a test that just doesn't make sense. You know, a test that, if it exists anywhere in the world, I think was the argument you made in your brief, then it's available. And you're just saying that is incorrect. And if we agree that that's incorrect, we don't need to go any further and we should just remand. That's correct. And we are not, again, we emphasize we are not asking the broad, all definition of not available and could not have been presented. We only focus on what the BIA decided. And BIA's reasoning is that issues related to accessibility are not the same as not available and could not have been presented or discovered. And we think that that particular reasoning is incorrect because it's not consistent with what the regulation says. And if the court agrees, the court can vacate and send the case back and readdress it. I'm sorry, but the reason you gave whoever was counsel at the time, gave the BIA, was he couldn't pay for it. And the BIA rejects that as a reason to allow him now to continue the proceedings because over the course of the time it took, he finally came up with enough money to hire an expert. I'm sorry, how does that violate the regulations? I don't think they adopted a rule, if it exists anywhere in the world, that's the end of the matter. I think they rejected the particular reason that was given to them. So, number one, I agree that the BIA did not say that the proper interpretation is whether the evidence physically exists at the time of the hearing. But here's what the BIA said. The question of whether the evidence was unavailable. But they are different from, there are various issues related to accessing the evidence. And that reasoning is not consistent with the regulation. Because the regulation has not only not available, but it also has, it could have been presented or discovered. And it could have been presented or discovered, it really goes into the due diligence, it goes into the degree of accessibility. So, what we are really focusing on is... Okay, so the BIA erred because it didn't address the second prong of the regulation. Is that the argument? So, we think the BIA got it wrong when it interpreted not available. You're saying it conflated the two parts.  And I have to say that the way the BIA addressed it, it's not even clear what they focused on. It said previously unavailable, but whether there were issues related to accessing the evidence. And that they made a conclusion. And we think that the BIA made an error when it only focused on the category for rejecting the accessibility issues. Okay, so are you saying that the evidence establishes there would have been a different outcome if they had considered what I'll call the second prong? Because normally, just pointing to an error doesn't do it. You have to show that the purported error actually made some difference. So, that prong is separate from the not available and could not have been presented and discovered. And BIA did address, we think that that's a materiality prong, whether the evidence would likely change the outcome of the proceeding. And because the IJ and BIA all focused on adverse credibility finding basis... So, why would an expert report likely change the outcome of a guy who is found not to be credible on a number of different grounds? That's because what the expert said in paragraph 71. The BIA had to accept the expert's testimony? No. In the face of adverse credibility findings of this sort? If I may. Yeah. The petitioner's adverse credibility finding is independent from what expert's credibility issue is. So, here, now, the expert did rely on the petitioner's testimony and then made some assessment. There's one part of the expert evidence that doesn't hinge on his credibility. So, even assuming that he's not telling the truth, that he doesn't have that degree of political conviction, he's not a political dissident, even if that's true, what the expert is saying is that the fact that he gave the human rights violation conducted by his own government, that puts him at special risk. And that's important, because even that... And this is the conduct after he got here, or the conduct before he got here? That's the conduct after he got here. And that's Judge Selye's point. I understand Your Honor's concern, but it still doesn't change the evidentiary assessment. And more important here is, it's not like the BI here, we acknowledge that there was one argument presented about the independent basis, independent from adverse credibility. That's not what the BI did. I thought really your main argument was they just didn't assess withholding or CAT at all, and so there's just a more fundamental legal error. We have no idea what they would have said about whether the evidence would have been... The evidence in front of them might have changed the outcome, because they just didn't look at it, right? Isn't that really the argument? That's correct. And I understand Judge Selye's concern. I understand Judge Lynch's concern. And those concerns, because those are concerns, the district can direct the BI if needed, for the BI to address those points. But here, as Judge Rickman said, as we argued in our brief, there's no mentioning of the independent basis for a CAT claim. And that's pretty important, because it's not discretionary relief.  And our case law supports that you need to look at that independently, correct? Correct. Thank you. If there's no further questions, we ask the Court to grant the petition. Thank you. Thank you, Counsel. Will Attorney for Respondent please come up and introduce yourself on the record to begin? May it please the Court, Jennifer Bowen on behalf of Respondent Merrick Garland. This is an adverse credibility case at its core, where the evidence that petitioners sought to submit on the first motion to remand and the second motion to reopen, the agency found... Speak up a little, please. The agency found... The agency found... would not likely have changed the end results. Now, before we go into all of that, I just want to note that all of petitioners' claims are based on the same set of facts. When all of the claims are based on the same set of facts, there is no independent claim to consider withholding and CAT. There's no independent ground. Instead, all of the facts, the agency looked at the record as a whole and found that the petitioner did not testify credibly and that there was no objective evidence within the record that would support those claims. There's no dispute here that generalized country conditions cannot support a claim for withholding or CAT, that you have a probability of either persecution or torture. But, counsel, what about the death certificates? His entire family was murdered. Your Honor, the agency looked at the death certificates and found that those death certificates did not corroborate petitioners' claims, where the death certificates provided that his father was a chauffeur and his testimony was that his father never worked as a chauffeur. The testimony on the record, which was noted earlier, you asked about whether or not the immigration judge was aware that his family had been murdered, and so the immigration judge noted that the death certificates provide assassination at domicile. There was a discussion between DHS counsel and the immigration judge about whether normally death certificates would provide cause of death, such as gunshot wound to the head or blunt force trauma. Here, it didn't say that. It said it was a very broad assassination at domicile. Between that and the discrepancy between the death certificates and the testimony related to his father's profession, the agency found that this did not corroborate his claims, and so they did not rely on them to make his claims. In addition, the death certificates would not address the other aspects of the adverse credibility. It would not address his testimony on cross that he was arrested in 2016 despite his statement on his asylum application that he'd never been arrested. It would not address his statement on cross that his godfather had to assist him out of the country under cover of night, which was never mentioned in his asylum application or his declaration, which the record shows he did have assistance of counsel for the declaration. It was the second counsel who submitted the declaration as opposed to the first counsel who submitted the application, and that he relayed to the immigration judge that he had reviewed his declaration and his application and had no amendments to that application other than to note his marriage. The death certificates would not address. I'm sorry. No, that's okay. Your brief did a very good job of laying out the credibility issues that the IJ found, and of course those are reviewed for substantial evidence, but I guess where you started was saying that there was no objective evidence in the record that he could be persecuted, and that's why I wanted to ask about the death certificates. I understand they just say assassination, a domicile, but if your entire family is assassinated and the claim is, you know, that they're political opponents of the current government, why is that not objective evidence in the government's view to support the claim? Even if the petitioner has been found to not be credible, that he was arrested, you know, things happened specifically to him, but nevertheless his entire family has been killed, so why is that not objective evidence to support the claim? Your Honor, I respectfully believe that if the petitioner comes forward and makes these claims and he's found to not be credible, the agency did not err in affording those death certificates limited weight, especially given the discrepancy between the death certificates and his testimony. That is why a respondent would argue the death certificates alone are not objective evidence. But what does the discrepancy go to, I guess, in the government's view? Why does it undermine his entire claim that he's going to be harmed when he returns to Congo? I think it's considered in total, though. It's considered in total that the adverse credibility decision or finding, in saying, will these death certificates overcome the adverse credibility finding? And the agency said no, because his claim is that he would be persecuted as his father's son. And so the agency looked at his testimony related to that and found him not credible, and therefore found that these death certificates did not carry the day. I also, before I forget, I would like to address, so, amici counsel asked the court to rely on paragraph 71 of the, paragraph 71 at 413 of the administrative record, which is where the expert report notes the, actually, I'm sorry, petitioner's counsel and amici counsel asked the court to look at whether he could be persecuted just based on having filed an asylum claim. I would note for the court that before the agency, there was no claim raised that he would be persecuted or tortured just simply on having filed an asylum claim. There's no evidence of a, those claims are confidential. There's no evidence that the Congo would be aware of that, and there's no case law that I'm aware of that an expert report can come forward and state a claim on behalf of petitioner. So, yes. Can I go back to the death certificate? You know, I've never heard of a death certificate that doesn't say, you know, a gunshot wound to the head, knife wound to the dementia, Alzheimer's, whatever, but instead draws a political conclusion, assassination. Maybe that's common in the Congo, but if I were presented with such a death certificate from this country, I'd immediately question whether this was real or not. Was there any testimony or anything that in the Congo, this is an accepted way of handling a death certificate? No, Your Honor. And that is the discussion that the transcript will reflect the immigration judge had with DHS counsel. There is no testimony or evidence presented on the record that this would have been a standard death certificate provision. Were the death certificates authenticated in any way? Your Honor. In other words, is there anything in the record that establishes that these are genuine public records or records of the government in the Congo? Your Honor, I do not recall any authentication of the death certificates. In fairness, I don't recall the agency questioning that. So respondent's argument doesn't rely on that. Instead, respondent's argument would go back to that the death certificates cannot corroborate his claims given the discrepancy between the death certificates and the fact that the- But counsel, you must have looked at the death certificates. You're arguing the case. Is there any certification or anything on or attached to the death certificates that sheds any light upon whether or not they're official documents? Your Honor, again, I do not recall that. Without the administrative record in front of me, I don't want to misrepresent to the court. I do not recall anything in the record authenticating. But, as you said, the government didn't argue that they weren't authentic, right? I'm not trying to make that argument. But I am trying to make the argument that the death certificates do not corroborate his claims that he was arrested, that he had to escape under cover of night, and related the admittedly false testimony to immigration officials at the border regarding his asserted adopted son, which notably his asylum application indicates he has no children. So I would, again, argue that the death certificates cannot carry the day and that the expert's opinion cannot create a claim for a petitioner. But, counsel, you know, I'm still just, if you didn't contest the authenticity of the death certificates and they used the word assassination, which, you know, as Judge Lynch indicated has a pretty specific meaning, your argument is just because they said chauffeur and the petitioner said his father was an attorney that that just negates, I'm just still trying to understand what negates the, because the death certificates were introduced to indicate that as my father's son, he was assassinated and I will be persecuted as his son. I assume you're not contesting it was his father that was killed and it says assassination. So it's just the fact that it was a stated chauffeur instead of attorney that negates the death certificates? Well, also the death certificates say assassination, they don't say that he was assassinated by the government. Assassination doesn't require that it had been the government. So the death certificates, which I believe is also a discussion between the DHS attorney and the immigration judge on the record. You're saying it could have been a private killing. Is that what you're arguing? I'm not trying to say anything. I'm merely trying to represent to the court that the agency did not err or abuse its discretion here. And so looking at the record as a whole. Yeah. If our standard is no reasonable adjudicator could possibly have concluded the way the BIA did and we can't reverse unless we make such a finding. You've now given three reasons and a general argument why the death certificate was not sufficient to overcome the various lack of credibility findings. Yes, Your Honor. And so with respect to the ACLU's argument regarding the motion to remand, I would argue that the court has no reason to consider the board's decision that the evidence, the brother's letter, the marriage certificate, and the expert report, that petitioner did not meet his burden to show that that evidence was not previously available because the board's alternative decision that this evidence did not have a reason, that this evidence would have changed the result of the proceedings. What about the argument that the BIA, though, didn't even assess whether it would have changed a withholding or CAT claim? I know you began with saying you think it's all really the same here because it's based on the same conduct, but can you just expand on that a bit? Your Honor, I don't think there are, I don't recall any dispute in the record, either in briefing or before the agency, that all of petitioner's claims rested on the same set of facts. The motion to remand that came before the board did not ask the agency to remand it to assert a new claim. So we're dealing with the same set of facts, and whether or not this new evidence would have allowed a likelihood of change, and the agency says, no, you didn't address these aspects of the adverse credibility finding. You're not meeting your burden because it is a heavy burden to reopen, rightfully so, given the interest that the government has in finality. So the agency found he didn't, there wasn't an objective, there wasn't an alternative claim that could have been supported a withholding and CAT claim. They were based on the same set of facts. So there's no new claim asserted in the motion to remand that the board should have alternatively considered and dependent from the adverse credibility finding. Should the BIA, though, at least have said we think the analysis is the same for removal and CAT, in your view? Where petitioner didn't make that argument in his motion to remand, I don't see why the agency needed to say that separately. Yeah. Judge Salia, do you have any further questions? No. Thank you, Your Honor. Respondent will rest on his brief. Thank you. Thank you, counsel. Will attorney for petitioner please reintroduce yourself on the record to begin? You have a one-minute rebuttal. Thank you. Stephanie Merzig for petitioner. I'm looking at page 8 of the motion to remand. This is page 375 of the administrative record. Even assuming that respondent's credibility is an issue, Dr. Carter's affidavit serves as objective evidence in support of his relief. And then it cites Aguilar-Escoto, Romulus v. Ashcroft to say that these do not require a subjective component. Regarding the death certificates, there is a process for the government to challenge authenticity. They have a lab. They can send documents there. If there's any question about whether the documents are authentic, in immigration court, the evidence will go back to them. I'm sorry. That's not the authenticity question. What do you mean they can test the document? They have death certificates from the Congo on hand at the lab, and they are supposed to check the paper. The government has said we didn't get to that issue, we didn't need to get to the issue, because the death certificate actually also contradicted his testimony. There was something fishy about it, and even if there was an assassination, it doesn't show it was by the government. Why do they have to go further than that? Well, again, if five people died, the Congolese government, whether they did the killings themselves or whether someone else did it, they were still unable or unwilling to protect this family. Also, just on the question of objective evidence, so there is now in this record, again, death certificates, expert report, and a newspaper article that the board could have considered in support of withholding a conviction against torture, and they did not go through that analysis. So respectfully, if there's no further questions, we do ask that you pass. Thank you. Thank you very much. Thank you, counsel. That concludes arguments in this case.